**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 09a0584n.06**

No. 07-1663

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
**Aug 19, 2009**
LEONARD GREEN, Clerk

RICARDO VILLAFLOR,

    Plaintiff-Appellee,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

**O P I N I O N**

**Before: KEITH, COLE, and WHITE, Circuit Judges.**

**WHITE, Circuit Judge.** Defendant State Farm Mutual Automobile Insurance Company

appeals the district court's order granting plaintiff Ricardo Villaflor (Villaflor)'s post-trial request

for attorney fees pursuant to section 3148 of Michigan's No-Fault Insurance Act, Mich. Comp. Laws

§ 500.3148, and its denial of defendant's motion for fees under the same provision. Finding no

abuse of discretion, we AFFIRM.

**BACKGROUND**

On January 19, 1994, Ricardo Villaflor was involved in a serious automobile accident when

he drove his car into the rear end of a semi truck that was stalled on the freeway. He was

unconscious at the scene, suffered very bad facial and chest injuries, and had to be extracted from

his vehicle with the jaws of life. The accident left him with a traumatic brain injury. He has been

unable to return to his job working as a hibachi-style chef at a Japanese steakhouse, and is treated

regularly for his continuing medical issues by a psychiatrist. Plaintiff's wife, Editha Villaflor (Mrs.

Villaflor), previously worked at a nursing home as a licensed practical nurse, but stopped soon after her husband's accident in order to take care of him, which she has done ever since.

At the time of the accident, plaintiff was insured under a no-fault automobile insurance policy issued by State Farm. At various times, State Farm paid attendant care benefits to Villaflor due to the injuries he suffered.[1] State Farm understood that Mrs. Villaflor was providing the attendant care for which it was paying. At other times, State Farm stopped paying benefits, requiring Villaflor to bring suit so that payments would resume. Prior to the instant suit, Villaflor filed three lawsuits against State Farm to recover overdue attendant care benefits—in 1994, 1997, and 1998. Each prior suit concluded with State Farm paying Villaflor's accrued attendant care benefits.

Between 1998 and 2003, State Farm did not ask Mrs. Villaflor to detail the services she was providing to her husband. Rather, the 1998 lawsuit was resolved with an agreement that State Farm would pay attendant care benefits at a daily rate of $250, and State Farm paid benefits accordingly. Bonnie Childs, the claims representative at State Farm who had assumed responsibility for plaintiff's claim in 1998, maintained an activity log for Villaflor's claim as part of Villaflor's file. A log entry

---

[1]At trial, Dr. Gerald Shiener—a psychiatrist who treated Villaflor and who has lectured on the subject of attendant care issues and frontal lobe brain injuries—testified as to what is commonly meant by the term "attendant care":

> [A]ttendant care is the use of an assisted individual to help someone who has a disability resume a more normal life and continue to function in the community. So it's someone who is available to an injured person who can help them do the things they can't do because of their injury and in terms of psychiatric issues or emotional issues who can provide supervision, reminders or cuing, limit setting, and advise [sic] and behavioral control and behavioral management for people who have impairments[.] . . . The goal of attendant care is to allow someone to lead as normal a life as possible with whatever limitations their injury has caused.

2

dated September 5, 2002 states in pertinent part that Villaflor is "unable to work since the accident,"
"his wife does [attendant] care at $250 a day" and "this was not broken down into hours since it can
vary as his daily needs vary."[2] This entry also states that Villaflor "has a [closed head injury],
emotional problems, increased irritability, sleep is poor, is easily disturbed by noises. . . . Per
rec[o]rds just rec[eive]d from Dr[.] Sh[ie]ner, Ricardo continues to need [attendant] care." The log
recounted that Villaflor had suffered a "traumatic injury to the brain [and] had [loss of
consciousness] of several hours" due to the accident, and that his "current medical problems and
head injury are related to the injuries received in this accident." In recounting the services Villaflor
required, the entry states that "he needs [attendant] care/[supervisory] care due to his [traumatic brain
injury] and emotional problems. We have a recent note from Dr[.] Sh[ie]ner that he continues to
need this care for his safety." The stated "clinical outcome" was that "he continues to need
counseling and aide care. He needs someone to [supervise] him for his safety."

In 2003, State Farm arranged for videotaped surveillance of plaintiff's activities on portions
of various days. State Farm interpreted the surveillance footage as undermining plaintiff's claim for
attendant care:

> The surveillance videos . . . revealed that Plaintiff was not, in fact, receiving 24-hour-
> a-day attendant care; that Plaintiff was apparently operating and performing in a
> music business; that Plaintiff was capable of operating a large conversion van, not
> owned by him prior to the accident; that Plaintiff was able to operate that van, both
> forward and backward, with a trailer attached; that Plaintiff could apparently direct
> others in activities; that Plaintiff was allowed to chauffeur his children to and from

---

[2]Another entry on this log—this one dated July 1, 2002—also states that the care his wife
provides is for "$250 a day" and is "not broken into hours since they vary."

school; that Plaintiff was driving over long distances; that he was driving without his wife in the van or the Escalade, and that Plaintiff was engaging in recreational basketball with apparent ease and coordination.[3]

State Farm asserts that it perceived a number of "inconsistencies" between the surveillance videos and the claim file. First, it contends that State Farm was paying for care on a 24-hour per day basis, but Villaflor was not receiving such care. Second, it argues it believed plaintiff could not drive alone, but the video showed he was doing so. Third, it concluded plaintiff's playing golf, playing with a band, and going to a gym were inconsistent with a report that his I.Q. was 64.

On June 30, 2003, Childs sent a letter to Dr. Gerald Shiener, who had been treating Villaflor, to request an update regarding Villaflor's condition and treatment. She did not disclose that surveillance had recently been conducted. In a letter to State Farm dated July 7, 2003, Dr. Shiener responded in part that "[i]n response to [the] additional request for information," he would "remind [her] that [she] requested a copy of [his] chart very recently" and that he "ha[s] been providing [her] with regular documentation and updates regarding Mr. Villaflor's condition." He wrote that Villaflor "has required ongoing 24 hour attendant care for poor impulse control and poor judgement." He further wrote that his "proposed treatment plan . . . is to continue to provide him with supportive psychotherapy aimed at helping him deal with his loss of independence and loss of ability to function as a provider and breadwinner for his family. His impairments are apparent to him

---

[3]The videotapes also showed numerous instances when plaintiff was driving and Mrs. Villaflor was accompanying her husband. As to plaintiff's playing basketball, defendant's surveillance report merely stated that on June 14, 2003, plaintiff was seen playing with a small basketball on his driveway with a child.

and he is demoralized at the prospect of ongoing disability." He stated that Villaflor's "need for medical attendant care is ongoing and continuous. He needs regular supervision on a 24 hour basis daily, 7 days a week. He needs supervision while awake because his judgement is impaired. He does not know his limitations. . . . He will wake up in the night, wander around the house, and engage in high risk activities that are dangerous to him and the family." Dr. Shiener concluded that Villaflor's need for constant supervision "continues to exist," and noted his belief that Villaflor "cannot drive alone, and is not safe spending time alone during the day because of his poor impulse control and impaired judgment." He observed that Villaflor's wife has provided "numerous examples of the patient's need for supervision and the difficulty that she has in addressing his problems with irritability and impulsive behavior."[4] Dr. Shiener's prognosis was guarded: "I do not feel that he will get better" and "I expect that in his late 40s or early 50s his cognitive function will begin to decline and his need for attendant care, supervision, and supportive services will increase."

---

[4]At trial, Dr. Shiener explained that it is common for someone with a frontal lobe brain injury like plaintiff's to not recognize one's own limitations. He also explained that even after viewing the surveillance videos, he is still of the opinion that it is unsafe for Villaflor to drive, concluding that "his driving was more an expression of his poor judgment and an expression of a struggle that he has had in trying to manage him than an expression or an indication of his ability to drive." In a June 2005 letter from Dr. Shiener to plaintiff's counsel that was introduced at trial, Dr. Shiener noted that "[i]t is not surprising that Mr. Villaflor's limited insight [] may cause him to occasionally resist certain restrictions on his activities that his wife, as his attendant care provider, seeks to impose." He observed that "while Mr. Villaflor should not drive a motor vehicle as a result of his traumatic brain injury, he expects to drive and occasionally may insist on driving since he is a male and the head of his household." He stated that Villaflor's driving "reflects both the delicate balancing act that Ms. Villaflor must perform and the unavoidable difficulty she occasionally confronts in attempting to ensure Mr. Villaflor's compliance with recommendations for his safety." He concluded by reiterating that he "ha[s] not seen anything in these tapes of surveillance that would lead me to change my opinion about Mr. Villaflor's need for attendant care in any way."

In July 2003, State Farm transferred plaintiff's claim from its Personal Injury Protection claims unit to its Special Investigations Unit. After August 2003, State Farm failed to pay any additional attendant care benefits. In a letter dated September 5, 2003 from Kim Grassel, a Claim Representative at State Farm's Special Investigations Unit, State Farm informed plaintiff that his claim had been reassigned, requested certain documentation, and asked for an interview "[t]o continue our handling of [the] claim." State Farm stated that "no further payment will be issued during the investigation process. Once our investigation is complete, we will be in a better position to determine whether additional payment is warranted." In a letter to Villaflor three days later, Sheila Smith of the Special Investigations Unit claimed State Farm had the following specific concerns:

> It is questionable whether you have given us all the details about the injury, treatment, or other information we need to determine the amount payable.
>
> It is questionable whether there is continuing need for attendant care due to injuries arising out of the motor vehicle accident of January 19, 1994.
>
> It is questionable whether you have made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy.

Plaintiff's counsel replied to State Farm on September 18, 2003. In that letter, counsel maintained that "[t]his file has been previously litigated and State Farm possesses all relevant information concerning the nature of Mr. Villaflor's disability and, since it has paid attendant care benefits, it equally knows what attendant care benefits have been incurred." It further stated that Villaflor had not been employed since his accident, and that "[t]here has been no change in his

condition to support State Farm's actions, and no activity on the part of Mr. Villaflor and his caregiver inconsistent with the nature of his traumatic brain injury." Counsel requested that attendant care benefits be reinstated immediately.

Plaintiff's attorney eventually consented to State Farm's attorney examining Villaflor under oath, in exchange for subsequently providing a copy of the surveillance footage to plaintiff. This sworn examination of Villaflor occurred on June 14, 2004. At one point, State Farm's counsel asked Villaflor about his driving:

> Q. Do you drive, sir?
> A. Yes.
> Q. Do you drive alone in the vehicle?
> A. Only when good days, my wife let me go.

Plaintiff's counsel also posed a series of questions:

> Q. Does your wife ever send you on little errands for her?
> A. Yeah.
> Q. Does she maintain telephone contact with you?
> A. Yes.
> Q. Does she, when you sometimes go out, follow you?
> A. Yes.
> Q. Has she followed you in the car when you've driven?
> A. Yes.
> . . .
> Q. Because of your brain injury, does your wife always monitor the activities you're doing?
> A. Yes.
> Q. And sometimes is monitoring those activities sending your son out with you?
> A. Yes.
> . . .
> Q. Do you have more bad days than you have good days?
> A. Yes.
> Q. Does your wife help you every day?
> A. Yes.

. . .

Q.      Since the accident has occurred, have you relied on her to tell you what you can do and can't do?

A.      Yes.

Q.      Has anything changed in that regard?

A.      No.

. . .

Q.      Has Dr. Shiner [sic] told you that you need your wife providing this care at all times?

A.      Yes.

Q.      And does she provide this care at all times, even if you go off on an errand alone?

A.      Yes.

Villaflor was also asked about his music activities. He testified that he has been involved with music and disc jockeying since his accident: "I go with my son. . . . I help. I just – during good days. I try to help. I try." He also testified that when he does this, he needs someone to supervise him, and his wife and son do so. He acknowledged playing keyboards—which he also played prior to his accident—and that he "jams" with a band on "good days" with his wife's permission.

After this examination, State Farm did not resume attendant care benefits. Thus, on July 28, 2004, plaintiff filed suit in Oakland County (Michigan) Circuit Court against State Farm. After recounting the three previous suits involving State Farm's refusal to pay benefits, plaintiff alleged that State Farm "continued to pay attendant care benefits until August 3, 2003, when, in spite of there being no change in Plaintiff's condition, Defendant failed and refused a fourth time to pay any attendant care benefits, even though repeated calls and demands for same were made on Defendant and counsel." Plaintiff further alleged that State Farm "has no proof that [his] condition has changed since the third resolution of this matter," and that his condition "has not changed." Plaintiff alleged

that he complied fully with the requirements of the policy and made demand on State Farm to comply with Michigan's No-Fault Act, but that State Farm refused to do so. Plaintiff sought declaratory relief, a money judgment for the benefits owed and accruing through the time of the entry of judgment, and attorney fees and interest as provided for under the No-Fault Act.[5]

Defendant removed the case to the Eastern District of Michigan. Plaintiff's motion to remand was denied. After a relatively contentious period of discovery, the case proceeded to trial. After hearing testimony and arguments, the jury reached its verdict in favor of plaintiff on September 29, 2006. The jury found that "allowable expenses," which the court defined as "all reasonable charges for reasonably necessary products, services, and accommodations for the plaintiff's care, recovery, or rehabilitation," had been incurred by or on behalf of Villaflor subsequent to State Farm's cessation of benefits in August 2003, and that State Farm owed Villaflor $156,000 for such expenses.[6] The jury also answered in the affirmative when asked whether "payment for any of the expenses to which the plaintiff was entitled" was "overdue."[7] Finally, the jury was asked to calculate

---

[5]Nowhere in the complaint did plaintiff specify the dollar amount he was seeking to recover from State Farm in the instant litigation.

[6]According to plaintiff, "[t]he jury awarded Plaintiff $156,000 for attendant care benefits from August 3, 2003 to September 29, 2006." Defendant maintains that the verdict of $156,000 means that the jury awarded plaintiff $1,000 per week for three years (*i.e.*, 156 weeks) of benefits.

[7]The verdict form provided the following definition: "Payment for an expense or loss is overdue if it is not paid within 30 days after the defendant receives reasonable proof of the fact and the amount of the claim. An overdue claim bears interest at the rate of 12 percent per annum from the date the expense or loss became overdue."

the penalty interest on the overdue benefits.[8]  The jury determined that the amount of such interest

owed to the plaintiff on his overdue benefits was $37,440.  The court thus entered judgment for

Villaflor in the amount of $193,440.

Plaintiff subsequently filed a motion for attorney fees, costs, expenses, and interest.  He

sought a total of $1,270,750.00 in attorney fees under Mich. Comp. Laws § 500.3148(1)[9] and Federal

Rules of Civil Procedure 11 and 37.  He specifically sought attorney fees pursuant to § 500.3148 in

the amount of $470,125.00, which he calculated by multiplying what he contended was the

reasonable hourly rate of $500/hour by the 940.25 hours he claimed his attorneys devoted to the case.

Besides attorney fees, he also sought various costs, expenses, and interest, and also asked for Rule

11 sanctions against State Farm.

Defendant opposed this motion, and also filed a motion for its own attorney fees pursuant

to Mich. Comp. Laws § 500.3148(2).[10]  It maintained in part that plaintiff "never presented or

---

[8]*See generally Moore v. Secura Ins.*, 759 N.W.2d 833 (Mich. 2008) (characterizing this calculation as statutory "penalty interest" for overdue benefits).

[9]Mich. Comp. Laws § 500.3148(1) provides for a claimant's attorney fees as follows:
An attorney is entitled to a reasonable fee for advising and representing a claimant in an action for personal or property protection insurance benefits which are overdue. The attorney's fee shall be a charge against the insurer in addition to the benefits recovered, if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment.

[10]Mich. Comp. Laws § 500.3148(2) provides for an insurer to recover its fees in certain situations:
An insurer may be allowed by a court an award of a reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation.

articulated any specific claim prior to litigation," but that plaintiff's counsel "demanded [$10 million] as damages at the time of the final settlement conference in this matter, and then, at trial Plaintiff presented a demand for benefits for between [$950,000] and [$1,450,000] as compensation for allegedly owed no-fault benefits provided to Plaintiff, which claim was then based on an alleged need for 24 hour a day attendant care." It argued that the jury's combined verdict "represents little more than between [13%] and [20%] of the excessive demand for benefits requested by Plaintiff." It also argued that [p]laintiff "never offered subjective proof" that he needed 24-hour care, and that the "surveillance video definitively established" that such care was not provided, "contrary to Plaintiff's assertions." State Farm thus contended that the jury's award, combined with the evidence and trial testimony, showed that plaintiff's claim was "in some respect fraudulent or so excessive as to have no reasonable foundation," such that defendant was entitled to an award of its attorney fees. Defendant requested attorney fees at the rate of $300/hour.

The district court held a hearing on these motions in February 2007. After hearing from both parties, the court stated on the record that plaintiff was entitled to attorney fees in this case because "it was unreasonable for the defendant not to pay something." In calculating the fees, the court took the averages of both counsels' claimed hours worked and requested rates. The court declined to award Rule 11 sanctions. The court issued an order awarding attorney fees pursuant to Mich. Comp.

> To the extent that personal or property protection insurance benefits are then due or thereafter come due to the claimant because of loss resulting from the injury on which the claim is based, such a fee may be treated as an offset against such benefits; also, judgment may be entered against the claimant for any amount of a fee awarded against him and not offset in this way or otherwise paid.

11

Laws § 500.3148(1) to plaintiff in the amount of $345,200 (863 hours multiplied by $400/hour),

denying plaintiff's motion for costs and sanctions, and denying defendant's motion for attorney fees.

Defendant subsequently filed a motion for reconsideration. The district court denied this

motion on April 19, 2007 in a written order, in which the court further explained the basis for its

ruling granting plaintiff's motion for attorney fees. The court observed, *inter alia*:

> Several facts support the court's conclusion that State Farm acted unreasonably when
> it terminated plaintiff's attendant care benefits—most recently—in August 2003.
> State Farm has a long history of paying benefits to Ricardo Villaflor, cutting them
> off, restoring the benefits after losing litigation, and then cutting off benefits again.
> This behavior is unreasonable because plaintiff's medical condition, and therefore
> his need for attendant care, has not changed. While State Farm keeps pointing to the
> video surveillance, trial testimony established that the videos simply show plaintiff
> performing activities State Farm knew he could do and which his physicians have
> said are consistent with his diagnosed need for attendant care.

The court also disposed of State Farm's argument that because evidence showed that Villaflor did

not need attendant care "on a 24/7 basis," his need for full-time care could therefore reasonably have

been questioned. The court noted that the no-fault statute includes a provision which "requires an

insurer to pay partial benefits even if the evidence does not support a claim for full benefits." *See*

J.A. 190 (quoting Mich. Comp. Laws § 500.3142(2) ("If reasonable proof is not supplied as to the

entire claim, the amount supported by reasonable proof is overdue if not paid within 30 days after

the proof is received by the insurer.")). The court found that State Farm "was required to pay *some*

*amount* for attendant care, even if the precise level of care was unclear at that time," and that State

Farm "clearly acted unreasonably by cutting plaintiff off in August 2003 and paying *no benefits*

*whatsoever* after that date." (Emphasis in the original.) Finally, the court observed that State Farm's

12

conduct "was all the more egregious because of its long history of litigation with Ricardo Villaflor."[11]  Under these circumstances, the court concluded, "there was no legitimate factual or legal dispute to justify State Farm's decision to terminate plaintiff's attendant care benefits."

## DISCUSSION

A trial court's award of attorney fees is generally reviewed for an abuse of discretion. *Shields v. Gov't Employees Hosp. Ass'n, Inc.*, 490 F.3d 511, 514-15 (6th Cir. 2007).  The district court's factual determinations are reviewed under the clearly erroneous standard, and its legal interpretations are reviewed de novo. *Id.* at 515.  The substantive issues are governed by Michigan law. *Id.*

**A.     Attorney Fees for Plaintiff**

The Michigan Supreme Court recently explained what an award of attorney fees under the applicable statute requires:

> MCL 500.3148(1) establishes two prerequisites for the award of attorney fees.  First, the benefits must be overdue, meaning "not paid within 30 days after [the] insurer receives reasonable proof of the fact and of the amount of loss sustained." MCL 500.3142(2).  Second, in postjudgment proceedings, the trial court must find that the insurer "unreasonably refused to pay the claim or unreasonably delayed in making proper payment."  MCL 500.3148(1).  Therefore, assigning the words in MCL 500.3142 and MCL 500.3148 their common and ordinary meaning, "attorney fees are payable only on overdue benefits for which the insurer has unreasonably refused to pay or unreasonably delayed in paying." *Proudfoot v. State Farm Mut. Ins. Co.*, 469 Mich. 476, 485, 673 N.W.2d 739 (2003) (emphasis omitted).

---

[11]The court also observed that the jury found that State Farm's payment for attendant care was "overdue"—that is to say, "[t]he jury has found, as a matter of fact, that defendant received 'reasonable proof' of [plaintiff's] entitlement to attendant care benefits in the amount of $156,000."

No. 07-1663
*Villaflor v. State Farm Mutual Automobile Insurance Co.*

*Moore*, 759 N.W.2d at 838. Whether an insurer "unreasonably refused to pay the claim or unreasonably delayed in making proper payment" is a question for the court. *Regents of the Univ. of Mich. v. State Farm Mut. Ins. Co.*, 650 N.W.2d 129, 139 (Mich. Ct. App. 2002). "The trial court's decision about whether the insurer acted reasonably involves a mixed question of law and fact. What constitutes reasonableness is a question of law, but whether the defendant's denial of benefits is reasonable under the particular facts of the case is a question of fact." *Ross v. Auto Club Group*, 748 N.W.2d 552, 555 (Mich. 2008).

### 1. Unreasonableness of Defendant's Refusal to Pay

State Farm first argues that this court should reverse the district court's award of attorney fees to plaintiff because, it claims, the district court "expressly found" that there was a "bona fide factual dispute as to the amount of Plaintiff's claim."[12] Defendant points to a statement made by the district court as part of its colloquy with defense counsel at the motion hearing, ignoring that it was made in the context of the court's considering whether State Farm was unreasonable in not paying *any* benefits and its conclusion that State Farm knew that it owed Villaflor benefits yet, unreasonably, paid him nothing. It does not appear that the district court expressly found that the refusal to pay was

---

[12]"The purpose of the no-fault act's attorney-fee penalty provision is to ensure prompt payment to the insured. Accordingly, an insurer's refusal or delay places a burden on the insurer to justify its refusal or delay. The insurer can meet this burden by showing that the refusal or delay is the product of a legitimate question of statutory construction, constitutional law, or factual uncertainty." *Ross*, 748 N.W.2d at 558. "[A] refusal or delay in payments by an insurer will not be found 'unreasonable' within the meaning of § 3148 where [it] is the product of a . . . bona fide factual uncertainty." *Gobler v. Auto-Owners Ins. Co.*, 404 N.W.2d 199, 205-06 (Mich. 1987); *see also Moore*, 759 N.W.2d at 843 ("[A]n insurer's initial refusal to pay no-fault benefits can be deemed reasonable even if it is later determined that the insurer was required to pay those benefits.").

14

"the product of a legitimate question of . . . factual uncertainty." *See Ross*, 748 N.W.2d at 558.

Moreover, in its motion for reconsideration, State Farm again argued to the district court that there

was "a 'legitimate question of factual uncertainty' as it relates to the nature, amount and frequency,

*if any*, of attendant care benefits actually performed (and thereby incurred) by Plaintiff." (Emphasis

added.) The court looked to the no-fault statute and, specifically, the provision which the district

court read as "requir[ing] an insurer to pay partial benefits even if the evidence does not support a

claim for full benefits." *See* J.A. 190 (citing Mich. Comp. Laws § 500.3142(2) ("If reasonable proof

is not supplied as to the entire claim, the amount supported by reasonable proof is overdue if not paid

within 30 days after the proof is received by the insurer.")). The court again rejected State Farm's

argument, concluding that State Farm "was required to pay *some amount* for attendant care, even if

the precise level of care was unclear at that time," and that State Farm "clearly acted unreasonably

by cutting plaintiff off in August 2003 and paying *no benefits whatsoever* after that date." (Emphasis

in the original.) The district court's conclusion that it was unreasonable for State Farm to refuse to

pay at least *some* benefits was not erroneous. "The fact that an insurer may be liable for some

expenses (i.e., those reasonably incurred) does not necessarily establish its liability for all of the

expenses. However, the fact that . . . some services [were provided] that [defendant] may have had

a bona fide reason for disputing does not justify making no payment." *McKelvie v. Auto Club Ins.*

*Ass'n*, 512 N.W.2d 74, 77 (Mich. Ct. App. 1994) (citations omitted).[13]

---

[13]This opinion in *McKelvie* addressed the trial court's award of attorney fees following trial. The Michigan Supreme Court denied leave to appeal that ruling. *McKelvie v. Auto Club Ins. Ass'n*, 525 N.W.2d 460 (1994) (Table). Plaintiff subsequently filed a motion for an award of appellate

State Farm also argues that the record demonstrates a legitimate factual dispute concerning the fact and amount of Villaflor's claim. The court found that State Farm's cutting off of Villaflor's benefits in August 2003 was unreasonable because "plaintiff's medical condition, and therefore his need for attendant care, has not changed," and that "the videos simply show plaintiff performing activities State Farm knew he could do." These findings are amply supported by the record. Prior to trial, State Farm admitted that it "knew before it began video surveillance on Ricardo Villaflor in 2003 that he goes on errands by himself" and "drives by himself," that "[n]obody advised between December, 2001 and July, 2003 that Ricardo Villaflor discontinued driving without supervision," that "[t]he frequency with which Ricardo Villaflor drove a vehicle without supervision remained the same between the period of December, 2001 to May, 2003 and the period of June, 2003 to October, 2003," that it knew before beginning video surveillance of Villaflor in 2003 that after his accident he "had attended a Drivers Rehabilitation Program at Providence Hospital," "continued to exhibit ability as a musician," "had been serving as the emcee at a Karaoke musical program," "continued to play the keyboards," "performed with a band," and "had been appearing as the keyboard player with a band," and that it knew prior to the surveillance that Villaflor "had played golf since the . . . accident." At trial, the individual at State Farm who had final say regarding approving or denying

---

attorney fees, which the trial court denied. The appeals court reversed that determination, *McKelvie v. Auto Club Ins. Ass'n*, 566 N.W.2d 658 (Mich. Ct. App. 1997), but the Michigan Supreme Court reversed the appeals court. *McKelvie v. Auto Club Ins. Ass'n*, 586 N.W.2d 395 (Mich. 1998). In doing so, the Michigan Supreme Court did not reverse or otherwise undermine the opinion we cite regarding the award of trial attorney fees. *See id.* (stating that it "reverse[s] the second judgment of the Court of Appeals").

benefits acknowledged that State Farm had information in its file before it received the surveillance videos that Villaflor would drive without another adult in the car, that he sometimes was outside the presence of his care provider, and that his need for attendant care and his receipt of attendant care varied from day to day. State Farm's continuing effort to argue that it was reasonable to question plaintiff's need for 24-hour care in light of the surveillance videos is disingenuous, given that the claims file never indicated that State Farm was making payments for 24 hours' care each day, and that the file shows it was understood that the number of hours of attendant care would vary.

Thus, State Farm's arguments that the surveillance footage and Dr. Shiener's July 2003 letter stating that Villaflor cannot drive alone somehow justified its suspension of benefits ring hollow. From its past dealings with Villaflor, State Farm knew Villaflor had driven alone, that his driving alone in his car did not mean he was not being monitored, and that one of Villaflor's impairments was poor judgment and impulsiveness. As Kim Grassel of the Special Investigations Unit testified, State Farm knew about "whatever information was found in the [claim] file." At trial, Bonnie Childs testified:

> Q.     Based upon your review of the surveillance video, if you had believed that the
> activity level shown in the surveillance video was consistent with what State Farm
> already knew from its file, then you would have believed it appropriate to continue
> to pay attending care benefits?
> A.     I would have paid. I would have had no questions.

Given that the footage in the surveillance video *was* consistent with what State Farm already knew, *see supra*, the court's conclusion as to unreasonableness is amply supported. If State Farm had simply reviewed its claim file before deciding to stop payments, it likely would not have believed

17

it needed additional information. We find no error in the district court's observation that "State Farm's conduct was all the more egregious because of its long history of litigation with Ricardo Villaflor." Given State Farm's history of litigation with Villaflor—litigation that always resulted in it having to resume paying benefits it owed—its failure to take this basic step before cutting off benefits a fourth time and thus again forcing Villaflor to court to vindicate his rights seems well outside the bounds of reasonable conduct.[14]

---

[14]State Farm argues that Villaflor should have responded to its twenty-two requests for information following its surveillance—requests which State Farm now recasts as simple requests as to the "amount" of the claim notwithstanding its initial 2003 letter suspending benefits which indicated the question existed "whether there is continuing need for attendant care." This argument ignores the history of these parties' dealings. State Farm already had information regarding the loss, and had been paying benefits to Villaflor for some time—including an uninterrupted period of years in which it paid benefits each month in amounts constituting $250 per day. Moreover, as plaintiff's counsel explained at the hearing on plaintiff's motion for attorney fees, typically claimants submit medical records and calendars showing the number of hours per day that services are being provided, but "that was not the[] way it was done" in this case. Rather, "[b]eginning in 2000, after resolution of the third lawsuit, for the next 38 months, payment was made without receipt of any calendars." State Farm's own activity logs show this. Indeed, State Farm admitted that it "determined that [plaintiff] was entitled to [the] attendant care benefits [paid] from December, 2001 to July, 2003," and that it determined that such benefits paid to plaintiff during that period "were reasonable and necessary." As plaintiff's counsel has explained, "[a]s of this point, there is a several-year history. There is copious medical [sic] that supports the need for attendant care. Everybody was well aware that there were periods of unsupervised time."

State Farm also argues that it "never denied Plaintiff's claim, but simply suspended payment of benefits because of Plaintiff's refusal to provide any documentation as to the amount of his loss." In fact, State Farm stopped paying benefits and *then* requested an interview and certain documentation, stating that "no further payment will be issued during the investigation process." It did so even though State Farm already had information in its own claim file—including information from Villaflor's prior lawsuits to obtain the benefits owed him—which readily revealed the tenuous nature of the supposed "inconsistencies" that gave rise to State Farm's suspicion and its resulting refusal to continue payments.

### 2.    Whether Benefits Were Overdue

State Farm also argues on appeal that the benefits owed to Villaflor were not "overdue," and thus no attorney fees can be awarded to Villaflor pursuant to the Michigan no-fault statute. "An attorney is entitled to a reasonable fee for advising and representing a claimant in an action for personal or property protection insurance benefits which are *overdue*." Mich. Comp. Laws § 500.3148(1) (emphasis added). "[P]ersonal protection insurance benefits become 'overdue' when an insurer fails to pay 'within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained.'" *Moore*, 759 N.W.2d at 835 (quoting Mich. Comp. Laws § 500.3142(2)).

State Farm's argument here is that "as a matter of law," no attorney fees can be awarded because "at the time of the initial refusal to pay, and at the time suit was filed, no benefits were overdue." It first contends that benefits were not "overdue" because Villaflor did not "submit[] proof as to the number of hours per day that his wife actually spent supervising him." Given the parties' prior arrangement and course of conduct, and given what State Farm admitted it already knew when it ceased paying benefits, *see supra*, this line of reasoning is without merit.

State Farm next contends that as a factual matter, "[t]he jury's award of only 24 months' interest is a finding that benefits were not overdue at the time Plaintiff filed his complaint." Because the jury in late September 2006 awarded 12% simple interest provided by statute[15] in the amount of $37,440, State Farm reasons, the jury must have determined that the benefits were only overdue for

[15]Mich. Comp. Laws § 500.3142(3).

two years—and thus only became overdue after plaintiff filed his complaint in July 2004—because $37,440 equals 24% of the $156,000 the jury awarded in allowable expenses. Because State Farm failed to raise this argument below, it is waived. *See, e.g., Taft Broad. Co. v. United States*, 929 F.2d 240, 243 (6th Cir. 1991) ("A long line of cases in this circuit strongly reinforces the principle that issues not litigated in the trial court are generally not appropriate for appellate consideration in the first instance."); *see also Shields*, 490 F.3d at 515. In any event, the argument fails on the merits as well. State Farm makes much of the recent Michigan Supreme Court decision of *Moore v. Secura Insurance*, 759 N.W.2d 833, but although that case endorses the propriety of a court examining the amount of statutory penalty interest awarded by a jury in order to determine how much time the jury believed the benefits were overdue, *see id.* at 838-39, it does not compel a different result in the instant case. The facts here do not lead to the same kind of unequivocal interpretation of the jury's calculation as the determination in *Moore*, and it would be speculative to read the jury's verdict in the instant case as its clear indication of the date on which State Farm had adequate proof of the claim. The jury's award of interest in this case could also reflect its recognition that the more recently-incurred attendant-care expenses had remained overdue for a lesser period of time.

**B. Attorney Fees for Defendant**

State Farm argues that the district court erred in not awarding it attorney fees pursuant to Mich. Comp. Laws § 500.3148(2), which states that "[a]n insurer may be allowed by a court an award of a reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable

foundation." Given our analysis *supra*, we cannot say that plaintiff's claim was "fraudulent." Nor can we say that the district court erred by not finding plaintiff's claim to be "so excessive as to have no reasonable foundation." Plaintiff acknowledges that he demanded $10 million at the final pre-trial conference, but states that this amount also reflected his belief that sanctions were warranted given the "tortuous history of litigation between the parties." Defendant's argument that plaintiff's claim was excessive because he was awarded less than 11% of what he purportedly requested from the jury in benefits is unavailing. Though the jury did not award plaintiff everything his counsel requested during closing argument, defendant's argument erroneously presupposes that plaintiff sought an award for the payment of benefits based on hourly figures.[16] Plaintiff's counsel's reference to the prevailing hourly rate in his closing argument was in the context of how much State Farm was paying Mrs. Villaflor for her services before it terminated payments versus how much more State Farm would reasonably have had to pay for outside caregivers who, like Mrs. Villaflor, would be available at any time.[17]

---

[16]During closing argument, plaintiff's counsel stated that "Mr. Villaflor and Mrs. Villaflor were getting paid attendant care benefits on a daily basis. Not a 24 *hours* basis, but a *daily* basis, it was a flat rate. And why was it a flat rate? Because State Farm knew, some doctor told them, that the number of hours of attendant care may vary." (Emphasis added.)

[17]At closing argument, plaintiff's counsel asked the jury to "decide what a reasonable charge is for the services of Mr. [sic] Villaflor. . . . Think about . . . the uncontradicted testimony[] from Dr. Ancell and Dr. Sewick regarding what reasonable charges are." Earlier, counsel had recounted that those doctors testified to an hourly rate of "somewhere in the neighborhood of $40 . . . . What we know is that for three years, . . . State Farm had been paying $250 a day. $250 a day for three shifts for the work of three people, seven days a week, no vacations, little resting, no benefits, a very hard job for Mrs. Villaflor to stay on top and continually guide and supervise and provide necessary assistance to her husband."

## <u>CONCLUSION</u>

This is the fourth lawsuit between these parties. The district court's decision is amply supported, and we AFFIRM.